Timothy A. La Sota (Arizona SBN 020539)
**TIMOTHY A. LA SOTA, PLC**
2198 East Camelback Road, Suite 305
Phoenix, Arizona 85016
Telephone: (602) 515-2649
Email: tim@timlasota.com
*Attorney for Plaintiff Tempe Tavern 1810, LLC*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tempe Tavern 1810, LLC, an Arizona limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>City of Tempe, a municipal corporation, Kenneth McCoy, in his individual capacity, Eric Hernandez, in his individual capacity, Luis Samudio, in his individual capacity, Ben Henry, in his individual capacity, Filbert Barrera, in his individual capacity, Juan Robles, in his individual capacity, and Does 1-50, in their individual capacities,<br><br>Defendants. | Case No. 2:26-cv-01272-SMB<br><br>**SECOND AMENDED COMPLAINT**<br><br>**(Jury Trial Requested)**<br><br>(assigned to the Honorable Susan M. Brnovich) |

Plaintiff Tempe Tavern 1810, LLC (the Plaintiff and its agents are referred to as "Tempe Tavern") submit this Complaint against Defendants City of Tempe, Kenneth McCoy, Eric Hernandez, Luis Samudio, Ben Henry and Juan Robles as follows.

1

**PRELIMINARY STATEMENT**

1.     Plaintiff Tempe Tavern brings this civil rights action under 42 U.S.C. §§ 1983 and 1985 to redress violations of its constitutional rights under the First and Fourteenth Amendments to the United States Constitution.

2.     Tempe Tavern operates a bar and restaurant at the northeast corner of McClintock Road and Apache Boulevard in Tempe, a location that is in close proximity to the main campus of Arizona State University.

3.     Defendants engaged in a pattern of selective enforcement, disproportionate regulatory action, reputational harm through official public statements, and retaliatory escalation of enforcement activity that have succeeded in largely destroying Tempe Tavern.

4.     This selective enforcement has taken the form of two large-scale enforcement actions, that is, raids, on Tempe Tavern in 2025, which have been highly publicized, in part thanks to the efforts of the Defendants.

5.     Despite these two raids, no significant violations were found on the part of Tempe Tavern.  The only violation of any sort that the Defendants were able to allege as part of the November 20, 2025 raid was a violation by an employee, not Tempe Tavern, of the security plan on file with the City of Tempe, a requirement that Tempe has of all bars.  The employee's sweatshirt obscured security identification on his underlying clothing.

6.     The violation has already been dismissed as part of a diversion agreement and did not result in any conviction or official finding of wrongdoing.

7.      The April 24, 2025 raid did result in a single alleged liquor violation, but the patron was 21 years old and had used a form of identification that the Arizona Department of Liquor Licenses and Control ("DLLC") views as unacceptable, the basis for the violation.  The identification was valid, and the patron could have used it to drive, cash a check or even board an airplane.

8.      Though many other establishments share the same circumstance as Tempe Tavern, these establishments have not been subjected to any of these enforcement efforts.

9.      Tempe Tavern also alleges state law tortious conduct that it asks this Court to take supplemental jurisdiction over. The City Defendants publicly associated Plaintiff with a fatal accident while withholding investigative documentation necessary for Plaintiff to respond to that assertion.  Tempe Tavern had nothing to do with this fatal accident, and Tempe knew this when it made these tortious assertions.

10.      The City of Tempe Defendants took unprecedented steps to publicize the fact that a person driving a car that was involved in a fatal collision had been at Tempe Tavern on the night of the fatal collision.  And though this person was also at other locations, including an event in the Arizona State University parking lot prior to a football game where alcohol was served, and house parties where alcohol and drugs were available, these were not mentioned by Tempe Police.

11.      Tempe Tavern operates a lawful operation and his highly scrupulous to ensure its adherence to all laws.  All patron identifications are checked, scanned and video recorded before the patron is admitted, with only those twenty-one years and older with a matching identification that appears genuine admitted.  This affords a complete defense under Arizona law to Tempe Tavern if it is later determined that a patron

falsified an identification.  On some occasions Tempe Tavern asks for additional identification to confirm the state-issued identification.  That is why Tempe Tavern has not received any citations for serving underage persons.

12.    Plaintiff seeks compensatory damages, punitive damages as permitted by law, and attorney's fees.

## JURISDICTION AND VENUE

13.    This is an action seeking to redress the violation of Plaintiff's right to due process and equal protection of the laws under the First and Fourteenth Amendments to the Constitution of the United States, as well as for defamatory conduct and placing Tempe Tavern in a false light, state torts.

14.    Plaintiffs assert this action against Defendants pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983.

15.    This Court has subject matter jurisdiction over Plaintiffs' federal law claims under 28 U.S.C. §§ 1331 and 1343(4).

16.    This Court has supplemental jurisdiction of Plaintiff's state law claims under Count IV, V, VII and VIII pursuant to 28 U.S.C. § 1367.

17.    Venue is proper in the United States District Court for the District of Arizona under 28 U.S.C. § 1391(B) because all or a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and in this division.

## PARTIES

18.    Plaintiff Tempe Tavern 1810 LLC is an Arizona limited liability company operating a licensed establishment in Tempe, Arizona.

19.    Plaintiff holds a valid liquor license issued under Arizona law.

20.    Plaintiff is subject to regulation by the Arizona Department of Liquor Licenses and Control and inspection by municipal authorities.

21.    Defendant City of Tempe is a municipal corporation organized under the laws of Arizona and acts under color of state law.

22.    Defendant Kenneth McCoy is the Chief of Police of the City of Tempe.

23.    Defendant Eric Hernandez is a Lieutenant with the Tempe Police Department who personally attended both 2025 raids and took video and photo footage for later use on the City of Tempe Police Department's Instagram account.

24.    Defendant Luis Samudio is a Lieutenant with the DLLC, and the individual who was the highest ranking Arizona Department of Liquor Licensing and Control official present at the 2025 raids of Tempe Tavern.

25.    Defendant Ben Henry is the Director of the DLLC.

26.    Defendant Filbert Barrera is a detective with the DLLC.

27.    Defendant Juan Robles is a Detective with the Tempe Police Department.

28.    Defendants DOES 1–50 are officers, agents, supervisors, and policymakers whose identities are presently unknown but who participated in the acts described herein.

## FACTS

### Plaintiff's Business Operations

29.    Plaintiff operates a lawful establishment open to the public.

30.    Plaintiff utilizes electronic identification scanning systems.  The identifications of all patrons are visually inspected before entry to the bar, and if the identification does not appear to be genuine, using scanning technology, and show the

patron to be of legal age to enter the establishment and drink alcohol, the patron is not admitted.

31.    Tempe Tavern video records all such identification verifications.

32.    Plaintiff maintains written compliance protocols regarding alcohol service.

33.    Plaintiff trains employees regarding underage drinking prevention.

34.    Plaintiff relies on its liquor license and public goodwill to operate.

35.    The City of Tempe has admitted in the training classes it provides to liquor establishments that the actions of Tempe Tavern in "demand[ing], examin[ing], match[ing] and verify[ing]" identifications as Tempe Tavern does provides a legal defense to a charge of unlawfully furnishing alcohol to a minor under Arizona Revised Statutes § 4-241.

**The March 22, 2025 Action**

36.    On March 22, 2025, a Tempe Police Sergeant approached Plaintiff outside the establishment.

37.    The Sergeant indicated that police did not enter bars, although they used to do so.

38.    Approximately thirty minutes later, the Sergeant returned with approximately ten officers.

39.    Officers entered Plaintiff's premises.

40.    Patrons were asked to produce identification.

41.    Staff were diverted from normal operations.

42.    No warrant was presented, no arrests were made, no citations were issued to Tempe Tavern, and no violation notices to Tempe Tavern followed.

43.    The visible police presence created public concern regarding Plaintiff's operations, but standing alone this single event did not have a significant effect on Tempe Tavern's ongoing business operations in that gross revenues did not diminish.

### April 24, 2025 Multi-Agency Raid

44.    On April 24, 2025, fifty-seven officers from multiple agencies conducted a coordinated enforcement operation at Plaintiff's establishment, this one involving both the City of Tempe Police Department and the DLLC.

45.    Officers entered during active business hours.

46.    Liquor compliance inspections were conducted.

47.    Fire inspections were conducted.

48.    Staff and patrons were questioned.

49.    Identification scanning logs were reviewed.

50.    No unlawful alcohol sales were documented.

51.    The DLLC cited Tempe Tavern for one liquor law ID violation, but the patron was in fact twenty-one years old.  The violation stemmed from accepting, in the DLLC's judgment, an unacceptable form of identification, not from service of alcohol to a person underaged.  The patron was not cited because, being twenty-one, was lawfully on the premises.

52.    No fire code violations were sustained.

53.     An occupancy citation was later issued, but was subsequently dismissed in court.

54.     Significant media attention attended the operation, upon information and belief, at least in part thanks to efforts by Defendants to publicize it.

**April 30, 2025 Code Compliance Notice**

55.     On or about April 30, 2025, City of Tempe Code Compliance staff hand-delivered a notice to Plaintiff.  The notice involved non-liquor related code violations such as longstanding use of barbed wire on the premises, as well as murals.

56.     Plaintiff corrected all cited issues within days, thereby resolving all matters cited after Tempe inspected to verify that the changes had been made.

57.     For other violations cited that were later determined to be the responsibility of the landlord, the City of Tempe initially issued a compliance notice, but subsequently closed it without the correctional work being performed.

58.     Upon information and belief, similarly situated properties were not subjected to equivalent urgency or even enforcement at all.

**May 2025 Enforcement Grant**

59.     In or around May 2025, DLLC received a grant of approximately $120,000 to increase enforcement against underage drinking.

60.     Following issuance of the grant, enforcement activity directed toward Plaintiff intensified.

61.     Additional compliance checks occurred in the form a subsequent raid.

62.     Upon information and belief, similarly situated establishments were not subjected to repeated large-scale operations during the same timeframe.

63.     Plaintiff appears to have been uniquely targeted during this period, and a significant amount of this grant, maybe a majority or even all of it, was used specifically to target Tempe Tavern.

**November 20, 2025 Multi-Agency Raid**

64.     On November 20, 2025, more than sixty agents participated in another coordinated enforcement action, this one also involving both the City of Tempe Police Department, the DLLC, and the United States Department of Homeland Security.

65.     Drone surveillance preceded the operation.

66.     Liquor and fire inspections were conducted.

67.      Fire inspections were conducted.

68.     No liquor violations were sustained.

69.     No fire violations were sustained.

70.     The only citation related to Tempe Tavern was one for a misdemeanor violation of Tempe Tavern's City of Tempe required security plan.  The citation was issued because the employee was wearing a sweatshirt that obscured his security identification his clothing.

71.     This citation was subsequently dismissed as part of a diversion offer from Tempe whereby the cited employee performed eight hours of community service.  No charge was ultimately officially sustained.

72.     No citation was issued against Plaintiff itself, only a staff member.

9

73. Public perception of wrongdoing increased following the raid.

74. Significant media attention attended the operation, upon information and belief, at least in part thanks to efforts by Defendants to publicize it.

**The City of Tempe's Tortious Smear of Tempe Tavern**

75. On November 22, 2025, the City of Tempe Police Department, despite an ongoing investigation, publicized the November 20, 2025 raid on its official Instagram account, complete with musical sound effects. There was no mention at this time of any previous fatal collision. Defendant Lt. Hernandez captured the video at the November 20, 2025 raid to use for this post.

76. On December 3, 2025 the City of Tempe deleted the original November 22, 2025 Instagram post and created a new Instagram post. The most significant addition was Tempe Police now claiming that Tempe Tavern was responsible for a death that occurred the previous September. (Exhibit 1). Also on December 3, 2025, the City of Tempe tortiously smeared Tempe Tavern with a "community service news" bulletin titled "Timeline Shows 19-Year-Old at Tempe Tavern Before Fatal Hit-and-Run." (Exhibit 2).

77. The September collision occurred on the morning of September 14, 2025, and took the life of motorcyclist. A woman, 19 years of age at the time ("Driver"), was driving one of the vehicles involved.

78. Tempe Tavern had nothing to do with this tragic collision, a fact the City of Tempe knew when it made these December 3, 2025 public communications. The Driver had been at Tempe Tavern previously that night, but she presented what appeared to be a genuine identification that listed her age as 22 at the time. This identification

was properly verified by Tempe Tavern staff, and the Driver walked home from Tempe Tavern, subsequently getting into her vehicle and ultimately the fatal collision.

79.    Tempe also indicated that this fatal collision was the reason, or a reason for the November 20, 2025 raid, but this false.  Tempe Police Department did not know that the Driver had been at Tempe Tavern on the night of September 13 and morning of September 14, 2025 at the time they organized and/or conducted that raid.

80.    These "news" reports were defamatory and placed Tempe Tavern in a false light, as if it had anything to do with this tragic death.

81.     Defendant Juan Robles wrote the report that placed Tempe Tavern at the center of a collision it had nothing to do with.

82.    The report was also written to justify the November raid when in fact neither the Tempe Police Department nor DLLC knew that fatal collision driver was at Tempe Tavern. The report was a post hoc effort to justify the second raid.

83.    The statements were issued while an investigation was ongoing.

84.    These tortious defamatory and false light actions have been successful in smearing Tempe Tavern.  Emblematic of the press coverage is an Arizona's Family (Channel 3) story titled "Tempe Tavern linked to suspect in deadly hit-and-run crash, police say." https://www.msn.com/en-us/news/crime/tempe-tavern-linked-to-deadly-hit-and-run-crash-suspect-police-say/ar-AA1RFb2z  This article starts out with the statement that "Police announced Wednesday that a 19-year-old suspect in a deadly September hit-and-run was partying at a popular Tempe college bar minutes before the collision."

**Police Report Requests and Delays and the DLLC Report**

85.     Beginning December 17, 2025, Plaintiff requested the official police report detailing the timeline of the Driver's whereabouts on the night of the collision.

86.     Plaintiff was informed it would be available shortly.

87.     The timeline was not released until February 2, 2026 after suit had been filed under the Arizona Public Records Law, A.R.S. § 39-121 *et. seq.*, *Deaver v. City of Tempe*, Maricopa County Superior Court case number CV2026-006381.

88.     During this period, the public narrative that Tempe Tavern had something to do with the fatal collision persisted.  The City of Tempe and DLLC both stated or intimated that the fatal collision in September of 2025 was a reason, or the reason for the November 2025 raid, but on information and belief, the City of Tempe and DLLC were unaware that the Driver had been at Tempe Tavern on the night of September 13 and or 14 of 2025 when they planned the November 2025 raid.

89.     Plaintiff lacked reports it was entitled to that would have afforded Tempe Tavern additional basis to respond to the attacks.

90.     In addition to the public records requests of the City of Tempe, Tempe Tavern made numerous public records requests of DLLC.

91.     To wit, on  February 24, 2026, Tempe Tavern's representatives requested all public records related to "DLLC investigations at or regarding Tempe Tavern from January 1, 2023 to current (February 24, 2026). Please include all documents, which include but are not limited to arrests of patrons of Tempe Tavern and citations issued to Tempe Tavern."  (Exhibit 3).

92.     On February 23, 2026, Tempe Tavern filed suit against the City of Tempe, Kenneth McCoy, Eric Hernandez, Luis Samudio, and Ben Henry in this cause of action.

93.    The cause of action alleged various First Amendment and other violations against DLLC and the City of Tempe.

94.    In retaliation for the exercise of its rights, DLLC took punitive action against Tempe Tavern.

95.    Upon information and belief, on or about March 2, 2026, DLLC started contacting various media outlets that it knew could be relied on to report almost anything DLLC said about Tempe Tavern.  From March 2 to March 9, 2026, no fewer than eight media outlets made public records requests for a "report" from DLLC about Tempe Tavern in relation to the November 2025 raid.

96.    Some media inquiries identified the report number, even though, upon information and belief, that number had not yet been released.

97.    As media inquiries started to pour in to Tempe Tavern on March 9, 2026 from media that obviously had been provided the report, undersigned counsel's staff member Laura Deaver sent an email at 12:45 p.m. to DLLC Licensing Supervisor Annie McKinney, who handles public records requests for DLLC stating:

Hi Annie,

I was checking on the new PRR I sent last week [the Public Records Request submitted on 2/24/26] regarding Tempe Tavern. I know you said that the turnaround time on those is extremely quick so I thought I'd check in and see how it's going.

If you have any questions, please reach out to me directly.

Thank you,

Laura Deaver

(Exhibit 4).

98. At 1:50 p.m., La Sota also emailed McKinney, stating:

Miss McKinney, I would like to add that multiple media sources are now saying they have this new report from DLLC saying we should have our license revoked. Obviously it was sent to them, please send it to us.  Thanks

Sent from my iPhone

*Id.*

99. Subsequently, in response to yet another media inquiry from an entity that clearly had the report, Mr. La Sota pressed Ms. McKinney, forwarding the Fox 10 email and stating: "Now here is another one...when will we actually be given the report?"

(Exhibit 5).

100. Tempe Tavern's legal counsel pressed Gino Duran, Assistant Attorney General assigned to DLLC and Deputy DLLC Director as to why Tempe Tavern had not been provided the report even though various media clearly had.  Mr. Duran responded as follows, at 5:34 p.m. on Monday, March 9, 2026, in an email to Tempe Tavern's attorney:

Mr. La Sota, The Department is in receipt of your public records request, wherein you request both reports and email conversations. Such requests take time to process and are handled in the order they were received. It is normal procedure to respond to such requests in their entirety, not piecemeal. However, due to your persistent and disrespectful emails to our custodian of records, I have directed that we send you the requested reports as soon as possible while we continue processing the remainder of your public records request. Please be prepared to pay the standard fees we charge for all such requests in accordance with law. Please cease sending any further emails to my staff. Direct any future requests or inquiries to me personally and I will attend to them accordingly.

(Exhibit 6).

14

101.    In response, La Sota stated at 5:38 p.m. that DLLC had already failed to provide the report:

Mr. Duran, we still have not received this report issued today. Forgive me for not being magnanimous about your claim that you will send this report as soon as possible. That commitment has already not been met—I have had no fewer than four different media outlets inquire as to this report. It is clear these outlets have been provided the report, or large parts of it. If they can be provided the report, then we could have already been provided this. Any efforts to speed this thing up at this point ring hollow, and smack of a self-serving post hoc effort to justify what DLLC has done. I have a hard time believing that the media outlets requested ONLY this report and that is why they received it, unless they were coached. But a public records request will reveal precisely the nature of these other media inquiries. I must also take strong issue with your claims that I have been disrespectful in my emails to staff. Can you please tell me what email was disrespectful? It is true that as the media inquiries have piled up I have pointed the fact out that everyone but us seems to have the report. This "disrespectful" claim is another complete falsehood.

(Exhibit 6).

102.    Mr. Duran closed out the email exchange at 6:46 p.m. that evening, stating: "The report will be provided in due course per my last email."  (Exhibit 6).

103.    That day and that evening, various news media reports both printed and ran stories on network broadcast news trashing Tempe Tavern and using the DLLC Report, Exhibit 7, which Tempe Tavern still did not have, as the basis.

104.    After effectuating its defamatory smear while depriving Tempe Tavern of the DLLC Report, which would have allowed Tempe Tavern to more effectively respond, on March 10, 2026 DLLC finally released the report to Tempe Tavern.

105.    Also on March 10, 2026, Ms. McKinney, contradicted Mr. Duran in an email sent at 7:51 a.m. to Tempe Tavern principle Rob Tasso as well as La Sota:

Good morning,

15

Upon reviewing your request we see that the documents were sent to your agency yesterday morning, at the same time that all of the media requests were fulfilled. By report, we assume that you are referring to the final report which we only recieved yesterday, and is a 2026 document that was not stated in your request. However, we are going to send it to you now at no extra charge, using the email address entered on the original request.

(Exhibit 5).

106.    This was not true, as Tempe Tavern was not sent the report until March 10, 2026, after the smear was completed. And Mr. Duran admitted that as of 6:36 p.m. March 9, 2026 the report had not been provided and would only be provided "in due course." But Ms. McKinney stated that Tempe Tavern was to receive the DLLC Report when everyone else did, which is required by the Arizona public records law, A.R.S. §39-121 *et. seq.*, but was ultimately denied to Tempe Tavern and withheld until the next day.

**The DLLC Report is Full of Fabrications and Falsehoods All Designed to Punish Tempe Tavern for Suing DLLC and to Smear Tempe Tavern**

107.    In September of 2025, a nineteen year old student at Arizona State University struck and killed a motorcyclist. Tempe P.D. did a report on this collision, concluding that alcohol was not a factor, and that the collision was caused by the deceased motorcyclist. (Exhibit 8, "Tempe P.D. Report"). This report has been publicly available since at least February 13, 2026.

108.    Upon information and belief, it is unprecedented for DLLC to investigate a non-DUI traffic citation.

109.    Despite these facts, DLLC has continued to publicly blame Tempe Tavern for the motorcyclists' death and claim that a legal violation committed by Tempe Tavern was the reason for the death, even though that is patently false and DLLC knows it.

16

110.    The DLLC Report contains the following fabrications on this point:

A.  At pages 1-2:

Throughout 2025, the establishment has demonstrated a systemic failure to maintain a safe environment, resulting in two of the largest enforcement actions in the history of the Arizona Department of Liquor Licenses and Control and a direct link to a tragic loss of life.

B.  At page 21:

Lethal Consequences: Serving 19-year-old Ava Bellowe for over two hours, which served as a direct contributing factor to the fatal collision and death of [REDACTED] on September 14, 2025.

C.  At page 4:

This investigation serves to document a persistent and lethal pattern of statutory non-compliance by Tempe Tavern, 1810 E. Apache Blvd, Tempe, regarding A.R.S. Title 4, Title 13 and municipal fire-life safety codes. Throughout 2025, the establishment has demonstrated a systemic failure to maintain a safe environment, resulting in two of the largest enforcement actions in the history of the Arizona Department of Liquor and a direct link to a tragic loss of life.

The gravity of this non-compliance is underscored by the following key investigative facts:

…

The September 14 Fatality: The establishment's failure to adhere to A.R.S. § 4-244 has been directly linked to the death of 18-year-old motorcyclist [REDACTED]. Evidence confirms that the 19-year-old driver involved in the fatal hit-and-run, Ava Bellowe, was drinking inside Tempe Tavern for over two hours (from 10:18 p.m. to 12:42 a.m.) immediately preceding the collision at 1:21a.m.

(Exhibit 7, DLLC Report).

111.    The Tempe P.D. Report contained the following finding: "Neither excessive speed nor impairment are considered factors in this matter."  (Exhibit 8, Tempe P.D. Report).

112.    The Tempe P.D. Report also found that the collision was ultimately the fault of the motorcyclist, who had failed to control his vehicle and rear-ended a northbound Waymo making a right turn from proper right turn lane on a major arterial street where there are three northbound lanes.  The motorcyclist then ended up in the middle northbound lane where Ms. Bellowe was driving, and was struck by her.

113.    Ms. Bellowe apparently had no chance of avoiding the collision.

114.    The Tempe P.D. Report also notes that Ms. Bellowe had a fake identification that indicated she was at least 22 years old:

*Video of Fake Driver's License*

While looking through the numerous videos on the Ava's cell phone, I located a video showing Ava holding a Florida Driver's License which can be presumed as being fake since Ava has a valid Arizona Driver's License. The video is titled, "67d4301e572021177664c0fe3907cf9b.decrypted" and was saved as, Florida Fake ID. The following information was written on the Florida Driver's License:…
          *DOB: [date redacted], year 2002.
          * Name - Ava Bellowe…

 (Exhibit 8).

115.    Tempe P.D. has also stated that Ms. Bellowe walked home from Tempe Tavern before deciding to get into her car and drive. (https://www.msn.com/en-

us/news/crime/tempe-tavern-linked-to-deadly-hit-and-run-crash-suspect-police-say/ar-AA1RFb2z).

116.    Despite all these facts, DLLC has persisted in its lie that Tempe Tavern is responsible for the tragic death.

117.    The DLLC Report contains other obvious fabrications.  One example is at page 21, DLLC claims that Tempe Tavern had made false statements and hindered its investigation:

A.R.S. § 4-210(A)(12): False Statements and Lack of Cooperation
The investigation revealed that the licensee and his agents provided false information to law enforcement and hindered investigations.

Surveillance Evasion: On multiple occasions (including the 2021 assault and the 2025 fatality investigation), the licensee claimed surveillance footage was unavailable, directly impeding the ability of law enforcement to investigate violent crimes and statutory violations.

118.    This is a fabrication.  The 2025 fatality investigation video did not exist when DLLC asked for it because video is taped over after 30 days, and DLLC did not ask for the video until three months after the night in question.  Tempe Tavern did not know that a person who had been involved in a fatal collision and been the driver was at Tempe Tavern earlier on the night of September 14, 2025 until December 3, 2026, thanks to Tempe P.D.'s Instagram post.  Counsel for Tempe Tavern informed DLLC of the lack of this video in December of 2025.  (Exhibit 9).

119.    The claim about the 2021 assault is also a fabrication.

120.    At page 5 of the DLLC Report, Barrera elaborates on what his claim of hindering investigation and making false statements:

Despite Tempe Police being previously told by staff that surveillance footage was unavailable—an act that hindered the initial police investigation—the victim later provided investigators with three videos of the encounter.  [DLLC Report, p. 5.]

121.    By Barrera's own admission, the alleged victim had the video.  That is because Tempe Tavern did provide the video when requested—that is how the alleged victim received it in the first instance, because Tempe Tavern had provided it.

122.    The assertion that Tempe Tavern refused to provide the video is simply a fabrication.

123.    At pages 17 and 18 of the DLLC Report, it states:

The staggering volume of 248 arrests—nearly the entire on scene capacity of the venue—proves that "meaningful examination" of identification was non-existent. The staff's failure to examine for security features, compare photos to physical subjects, and scrutinize "reasonable appearance" constitutes a gross violation of A.R.S. § 4-241. The establishment acted with "willful blindness," converting a mandatory safety protocol into a tool for facilitating illegal activity.

I recommend 248 charges for Arizona Revised Statute § 4-241 Failure to Verify Age/Improper Examination

(Exhibit 7).

124.    Various DLLC reports note that many of these 248 patrons admitted to using a fake identification.  And DLLC has admitted how difficult it can be to determine if an identification is genuine.

125.    To wit, in an interview with Channel 12 News, Defendant Samudio made various admissions with regard to fake identifications.  To wit, the report quoted and paraphrased Samudio as follows:

Lieutenant Luis Samudio with the Department of Liquor Licenses and Control said the use of high-quality fake IDs is a growing challenge.

"It's very tough sometimes to really detect them.  That's how good they are," he said.

He added that some fakes include scannable barcodes.

(Exhibit 10).

126.    The DLLC Report also alleges:

The actions of Licensee Robert Tasso…constitute a documented pattern of non-compliance with A.R.S. § 4-210.A.9, which mandates cooperation with Department of Liquor Licenses and Control (DLLC) investigations. On February 2, 2026, Tasso failed to appear for a scheduled interview at the DLLC, with his counsel, Timothy La Sota, citing media concerns as a pretext for non-attendance.

(Exhibit 7, DLLC Report, p. 14).

127.    This is another fabrication.  La Sota had agreed to the interview but stated, on Thursday, January 29, 2026:

But I just want to make sure that Tempe PD is not planning this as some kind of "media moment" to capitalize on this for media purposes.  Tempe PD has used Instagram and the media to besmirch my client in the past...that is why it is a concern.  Can you verify that there are no intentions to use this to seek a media advantage?

(Exhibit 11)

128.    Barrera assured La Sota that this would not happen.  (Exhibit 11).

129.    Two days later, on Saturday, January 31, 2026 Tempe Tavern received a media inquiry about the DLLC investigation and how ABC 15 had heard it was "almost coming to a close."

130. Tempe Tavern believed that this was precisely the type of media gamesmanship that DLLC had said would not occur, and DLLC had broken its commitment.

131. The next business day after the media inquiry, Tempe Tavern notified DLLC what had happened and that it would not appear for the subsequent interview.

## The Hazy Genesis of the November 2025 Raid

132. The DLLC Report states the following about the genesis of the November 2025 raid:

On or about October 29, 2025, DLLC Lieutenant Samudio and I discussed the potential for a secondary enforcement operation regarding Tempe Tavern. Lt. Samudio indicated he had been contacted by the Tempe Police Department (TPD) and requested that I follow up with them to determine the justification for a second detail. On that same date, I emailed TPD Sergeant Damon DeSpain to request a callback. On October 31, 2025, Sgt. DeSpain responded via email, confirming TPD's interest in a second joint operation and suggesting a tentative date of Thursday, November 13. He also requested a meeting for the following week to coordinate logistics, tentatively suggesting November 4 or 6. On November 12, 2025, at 1600 hours, a planning meeting was conducted via video conference. During this meeting, TPD and DLLC finalized the logistics and agreed to commit the necessary resources for the detail. The joint operation was officially scheduled for November 20, 2025.

DLLC Report, pp. 11-12.

133. This account is contradicted by an email from Director Henry to Samudio, Barrera and Duran, among others, dated December 5, 2025, which states:

Before our meeting on Thursday, December 11, 2025, please have Fil [Filbert Barrera] reach out to Tempe PD to obtain the full police report. We specifically need the details regarding Tempe Tavern and the suspect, Ava L. Bellowe, to understand their relationship as reported in the news.

According to several local news reports (like the one linked below), Tempe police reportedly placed Ms. Bellowe, who was 19 at the time, at Tempe Tavern during the evening of Saturday, September 13, 2025, and/or the early morning of Sunday, September 14, 2025. The reports state Ms. Bellowe left the bar, got into a Camaro, and was involved in an accident with a motorcycle driver at 1:21 AM. She allegedly fled the scene, and the motorcycle driver later died from his injuries.

Furthermore, a Form IV indicates Ms. Bellowe contacted Tempe police around 7:00 AM that morning, admitting involvement in the hit-and-run, and was arrested on Monday, September 15, 2025, at 6:00 PM. None of this information appears in the reports we received from the Tempe attorney.

Please confirm if anyone from DLLC was provided with this information— specifically about the deadly hit-and-run and Ms. Bellowe being at Tempe Tavern in September—other than seeing it in the news.

Additionally, please provide a statement regarding Tempe's request in October for DLLC assistance with a November "raid" on Tempe Tavern, and the basis for this action.

The news link is provided below:
https://www.fox10phoenix.com/news/woman-hit-and-run-suspect-visited-tempe-bar-hours-before-deadly-crash-pd-says

Thanks,
Ben

(Exhibit 12).

134. It is clear that DLLC was just then, in December, learning about the Driver's presence at Tempe Tavern on the night of September 13 and 14, 2025, and despite Tempe P.D. claims to the contrary, the November 2025 raid was planned before DLLC or Tempe knew of the Driver's presence at Tempe Tavern.

135. It also appears that the Director was trying to pin the blame on Tempe for the second raid and claiming it was their request for assistance, whereas the DLLC Report seems to indicate the November 2025 raid was DLLC's idea.

**Harm to Tempe Tavern and Ongoing Nature of Actions**

136. Tempe Tavern has suffered significant damages as a result of the tortious actions of the Defendants.

137. The City of Tempe has adopted what amounts to a policy or custom of actions against Tempe Tavern designed to destroy Tempe Tavern.

138. Tempe Tavern's business has diminished significantly, and its gross sales are down 80 to 90% from what they were prior to the 2025 raids.

### COUNT ONE

**Violation of Plaintiff's right to equal protection of the laws under the First and Fourteenth Amendments to the Constitution of the United States**

**(All Defendants)**

139. Plaintiff realleges the preceding paragraphs of the Complaint as if fully stated herein.

140. The First and Fourteenth Amendments to the United States Constitution protect the rights of all citizens to due process and equal protection of the laws.

141. 42 U.S.C. § 1983 provides for a civil cause of action for damages for each citizen for any "deprivation of any rights, privileges, or immunities secured by the Constitution."

142. A Plaintiff may prevail on an equal protection claim by showing disparate treatment that has no rational basis. *Benson v. Arizona State Bd. of Dental Examiners*, 673 F.2d 272, 277 (9th Cir. 1982)

143. Plaintiff was intentionally treated differently than other applicants for a dual license in the same circumstance.

144. Defendants intentionally subjected Plaintiff to selective enforcement.

145. Plaintiff was treated differently from similarly situated establishments.

146. No rational basis justified Defendants actions of targeting Tempe Tavern while ignoring everyone else that was in a similar situation.

147. Defendants violated Plaintiff's right to equal protection.

148. No reasonable official could believe it lawful to engage in the disparate treatment described above and the Defendants are not entitled to qualified immunity.

149. For the individual Defendants, To the extent that these violations were also carried out by their subordinates, Defendants are also liable for such violations because Defendants either directed their subordinates' conduct, or had knowledge of and acquiesced in the unconstitutional conduct carried out by their subordinates.

**COUNT TWO**

**Violation of Plaintiff's Right to Due Process Prior to Deprivation of Property**

**(All Defendants)**

150. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully stated here.

151. The Fourth and Fourteenth Amendments to the United States Constitution protect an individual's right to property, and prohibit the government from taking adverse steps that result in deprivation of property without due process.

152. To have a property interest protectable by the Fourth and Fourteenth Amendment to United Constitutionals, a person "must…have a legitimate claim of

entitlement to it." *The Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

153. That a state licensure scheme confers protectable property rights is confirmed by the statutory scheme authorizing the issuance of licenses in the first instance. *Barry v. Barchi*, 443 U.S. 55, 70 (1979).

154. Plaintiff possessed a protectable property interest in its liquor license and the goodwill it has been able to generate from use of this license.

155. Defendants' conduct deprived Plaintiff of a property interest while affording Plaintiff no satisfactory pre-deprivation due process, a violation of the United States Constitution.

156. Plaintiff was deprived of protected interests without adequate process.

157. There is no qualified immunity as the violations here are of clearly established rights that any reasonable official should be aware of.

158. For the individual Defendants, To the extent that these violations were also carried out by their subordinates, Defendants are also liable for such violations because Defendants either directed their subordinates' conduct, or had knowledge of and acquiesced in the unconstitutional conduct carried out by their subordinates.

## **COUNT THREE**

**Civil Conspiracy Under 42 U.S.C. § 1985**

**(All Defendants)**

159. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully stated here.

160. Defendants acted in concert to deprive Plaintiff of equal protection and due process rights guaranteed by the Arizona Constitution.

161. Overt acts included coordinated raids, public communications, and investigative delay.

162. The conspiracy resulted in economic injury.

163. There is no qualified immunity as the violations here are of clearly established rights that any reasonable official should be aware of.

164. For the individual Defendants, To the extent that these violations were also carried out by their subordinates, Defendants are also liable for such violations because Defendants either directed their subordinates' conduct, or had knowledge of and acquiesced in the unconstitutional conduct carried out by their subordinates.

**<u>COUNT FOUR</u>**

**False Light Invasion of Privacy and Right to Privacy**

**(City of Tempe, Kenneth McCoy, and Eric Hernandez)**

165. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully stated here.

166. Under Arizona law, "[o]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 338 (1989).

167. All elements required to prove the tort of false light are present.

168. Even if it is not an actual claim (it is) of involvement by Tempe Tavern, Tempe Tavern has been placed in a false light, and any reasonable person would be highly offended about being wrongly blamed for a young person's tragic death.

169. Tempe knows the facts, and knew the facts at all relevant times, surrounding the Driver's activities on the night of September 13 and morning of September 14, 2025.

170. The City of Tempe knows the fatal collision did not involve Tempe Tavern, and yet nonetheless published this information. In the alternative, the City of Tempe acted in reckless disregard as to the falsity of the publicized matter and the false light in which Tempe Tavern would be placed.

171. The Driver was at a number of other places that evening and night that had alcohol, including an event associated with a home football game of Arizona State University prior to the game in the ASU parking lot, and house parties with alcohol.

172. None of these other persons and entities have been subject to this tortious smear campaign.

173. Tempe Tavern has been significantly damaged by Tempe's actions in the form of lost revenue.

## COUNT FIVE

### Defamation

### (City of Tempe, Kenneth McCoy and Eric Hernandez)

174. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully stated here.

175. Under Arizona law, a defamatory publication regarding a private figure on matters of private concern "must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach [that person]'s honesty, integrity, virtue, or reputation." *Turner*, 174 Ariz. at 203–04, 848 P.2d at 288–289 (quoting *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 341 (1989)).

176. In addition, the Defendant must act at least negligently as to the truth or falsity of the matter asserted. *Scottsdale Pub., Inc. v. Superior Court In and For Cnty. of Maricopa*, 159 Ariz. 72, 75 (App. 1988).

177. Tempe Tavern had nothing to do with the motorcyclists' tragic death, Tempe knew of this, or acted at least negligently in asserting to the contrary.

178. Tempe's conduct meets the elements necessary to sustain a claim for defamation.

179. Tempe Tavern has been significantly damaged by Tempe's actions in the form of lost revenue.

## COUNT SIX

### Violation of Tempe Tavern's Rights under the First Amendment

29

**(Ben Henry, Luis Samudio, and Filbert Barrera)**

180.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully stated here.

181.    "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right,' and the law is settled that as a general matter the First Amendment prohibits  government officials from subjecting an individual to retaliatory actions ... for speaking out." *Bello-Reyes v. Gaynor*, 985 F.3d 696, 699–700 (9th Cir. 2021)(quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (alteration in original) .

182.    A plaintiff making a First Amendment retaliation claim must allege "that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *Capp v. Cty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (quoting *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016)).

183.    Tempe Tavern has a constitutional right to seek redress in the Court system and to speak out against the various abuses by DLLC.

184.    Being subjected to a defamatory smear campaign that blamed Tempe Tavern for the death of a young man, and seeking termination of Tempe Tavern's liquor license and therefore its business would chill a person of ordinary firmness from continuing to exercise the person's rights.

185.    The constitutionally protected activity on the part of Tempe Tavern was at least a substantial factor in the defendant's conduct.  No citations had been issued against

Tempe Tavern as a result of the November 2025 raid, and such citations are routinely issued on the night of the infractions.  But after this lawsuit, DLLC recommended that Tempe Tavern be cited for a whopping 753 liquor violations.

186.    During the November 2025 raid, DLLC conducted a liquor compliance check and did not allege a single violation.  (Exhibit 13).

187.    During the March 2025 raid DLLC compliance check, DLLC cited a single violation for accepting an unacceptable form of identification.  The patron was 21 years of age or older, and the identification was valid to board an airplane, but not acceptable according to DLLC because it had not been updated.  (Exhibit 14).

188.    There is no qualified immunity as the violations here are of clearly established rights that any reasonable official should be aware of.

189.    For the individual Defendants, To the extent that these violations were also carried out by their subordinates, Defendants are also liable for such violations because Defendants either directed their subordinates' conduct, or had knowledge of and acquiesced in the unconstitutional conduct carried out by their subordinates.

## COUNT SEVEN

**False Light Invasion of Privacy and Right to Privacy**

**(Ben Henry, Luis Samudio, and Filbert Barrera)**

190.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully stated here.

191.    Even if it is not an actual claim (it is) of involvement by Tempe Tavern, Tempe Tavern has been placed in a false light, and any reasonable person

31

would be highly offended about being wrongly blamed for a young person's tragic death.

192.    DLLC knows the facts, and knew the facts at all relevant times, surrounding the Driver's activities on the night of September 13 and morning of September 14, 2025.

193.    DLLC knows the fatal collision did not involve Tempe Tavern, and yet nonetheless published this information.  In the alternative, DLLC acted in reckless disregard as to the falsity of the publicized matter and the false light in which Tempe Tavern would be placed.

194.    The Driver was at a number of other places that evening and night that had alcohol, including an event associated with a home football game of Arizona State University prior to the game in the ASU parking lot, and house parties with alcohol.

195.    None of these other persons and entities have been subject to this tortious smear campaign.

196.    Tempe Tavern has been significantly damaged by DLLC's actions in the form of lost revenue.

## COUNT EIGHT

### Defamation

### (Ben Henry, Luis Samudio, and Filbert Barrera)

197.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully stated here.

198.    By making various statements falsely claiming that Tempe Tavern was responsible for the motorcyclist's death, DLLC has defamed Tempe Tavern.

32

199.    Tempe Tavern has been damaged as a result of this defamation.

## **PRAYER FOR RELIEF**

WHEREFORE, having fully pled the causes of action, Plaintiff respectfully requests this Court to:

A.    Award Plaintiff nominal damages against each Defendant, jointly and severally, in the amount of $1.00;

B.    Award Plaintiff compensatory damages against each Defendant, jointly and severally, in an amount to be determined at trial;

C.    Award Plaintiff punitive damages against each Defendant, jointly and severally, in an amount to be determined at trial;

D.    Award Plaintiff its reasonable attorney fees and costs pursuant to 42 U.S.C. §1988, and any other applicable law; and

E.    Award Plaintiff all other relief that is just and appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial on all issues in this litigation that are triable to a jury.

**RESPECTFULLY SUBMITTED** this 30th day of April, 2026.

                                        **TIMOTHY A. LA SOTA, PLC**


                        By:    /s/ Timothy A. La Sota
                               TIMOTHY A. LA SOTA
                               2198 E. CAMELBACK RD., # 305
                               PHOENIX, ARIZONA 85016
                               ***Attorney for Plaintiff Tempe Tavern***
                               ***1810, LLC***